WAVERLY D. CRENSHAW, JR. CHIEF UNITED STATES DISTRICT JUDGE
Comprehensive Security Inc., Associated Protected Service, Inc., and OnTrac Security LLC (together "Plaintiffs") bring this action against Metropolitan Government of Nashville and Davidson County ("Metro") for injunctive relief, alleging violations of Section 2 of the Sherman Act for monopolization and attempted monopolization. Before the Court is Metro's Motion to Dismiss (Doc. No. 13). As explained below, the motion is denied.
I. Factual Allegations
Plaintiffs operate private, security-for-hire companies in Davidson County and surrounding areas, hiring Peace Officer Standards and Training ("POST") certified police officers and licensed security guards to provide static security, mobile security, and traffic control. (Doc. No. 1 ¶¶ 4, 10.) Plaintiffs have hired both Metro Nashville Police Department ("MNPD") officers and non-MNPD police officers who are POST-certified. (Id. ¶ 10.) Plaintiffs allege that MNPD has engaged in three types of anticompetitive conduct.
First, Plaintiffs allege MNPD undercuts prices and operates at a loss. MNPD required private security companies to reveal their hourly charges and reduced their hourly rate to below cost based on this information. (Id. ¶ 20.)
Second, Plaintiffs allege MNPD uses the Form 150 to stifle competition. (See id. ¶¶ 22-26.) MNPD officers are required to obtain written permission from the MNPD to engage in secondary employment on Metro's "Form 150 Secondary Employment Request." (Id. ¶ 22.) The MNPD instituted procedural hurdles for officers seeking secondary employment with private security companies, often requiring them to submit multiple Form 150s and have the company answer multiple rounds of questions prior to approving their Form 150. (Id. ¶¶ 25-26.)
Third, MNPD requires event coordinators and vendors to use MNPD officers and forbids their officers from working for private security companies. (Id. ¶¶ 27-33.) MNPD representatives inform event coordinators at Special Events Committee meetings that they must use MNPD officers to handle traffic control and security. (Id. ¶ 27.) On January 26, 2018, MNPD published a written policy forbidding MNPD officers from working for private security companies at special events. (Id. ¶ 32.)
II. Standard of Review
For purposes of a motion to dismiss, the Court must take all of the factual allegations in the complaint as true. Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Id. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Id. When there are well-pleaded factual allegations, *1097 a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Id. at 679, 129 S.Ct. 1937. A legal conclusion couched as a factual allegation need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient. Fritz v. Charter Township of Comstock, 592 F.3d 718, 722 (6th Cir. 2010).
III. Analysis
A. State Action Doctrine
Metro moves to dismiss the case under the state action doctrine, which it claims provides it with immunity from Plaintiffs' antitrust claims. In the landmark case of Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), the Supreme Court held that states are exempt from antitrust liability under the Sherman Antitrust Act. Id. at 352, 63 S.Ct. 307. However, since Parker, the Supreme Court has also stressed that state action immunity is "disfavored." See F.T.C. v. Phoebe Putney Health Sys., Inc., 568 U.S. 216, 225, 133 S.Ct. 1003, 185 L.Ed.2d 43 (2013) ("[G]iven the fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws, 'state-action immunity is disfavored.' " (quoting F.T.C. v. Ticor Title Ins. Co., 504 U.S. 621, 636, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992) ) ).
Because municipalities are not sovereign entities, they are not automatically exempt from the antitrust laws under Parker. See Town of Hallie v. City of Eau Claire, 471 U.S. 34, 38, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985) ; Cmty. Commc'ns Co. v. City of Boulder, 455 U.S. 40, 50-51, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982). Municipalities are exempt from antitrust laws if they can establish a "clearly articulated and affirmatively expressed" state policy to authorize anticompetitive conduct. Hallie, 471 U.S. at 39, 105 S.Ct. 1713. It is unnecessary for a state legislature to "expressly state in a statute or its legislative history that the legislature intends for the delegated action to have anticompetitive effects." Phoebe Putney, 568 U.S. at 226, 133 S.Ct. 1003 (quoting Hallie, 471 U.S. at 43, 105 S.Ct. 1713 ). However, grants of general or neutral authority to govern local affairs will not satisfy the "clear articulation" component of the state action exemption from antitrust liability. Michigan Paytel Joint Venture v. City of Detroit, 287 F.3d 527, 534 (6th Cir. 2002). A state policy has been clearly articulated and affirmatively expressed "if the anticompetitive effect was the 'foreseeable result' of what the State authorized." Phoebe Putney, 568 U.S. at 227, 133 S.Ct. 1003 (quoting Hallie, 471 U.S. at 42, 105 S.Ct. 1713 ). Courts must be careful not to "appl[y] the concept of 'foreseeability' from [the] clear-articulation test too loosely." See id. at 229, 133 S.Ct. 1003. An anticompetitive effect is foreseeable if it is "the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature." Id.
The Supreme Court has illustrated the foreseeability requirement in two seminal cases: Boulder, on the one hand, and Hallie, on the other. In Boulder, the Supreme Court addressed an amendment to Colorado's Constitution, which organizes the City of Boulder as a "home rule" municipality. 455 U.S. at 43-44, 102 S.Ct. 835. Under this "home rule" amendment, the City of Boulder is entitled to exercise "the full right of self-government in both local and municipal matters." Id. Although Boulder argued that the amendment provided it with antitrust immunity regarding its regulation of cable television, the Supreme Court held that it did not satisfy the "clear articulation" component of the state action doctrine because it was a neutral grant of authority that allocated only the most general authority to Boulder to govern local affairs and did not address cable television. See id. at 53-57, 102 S.Ct. 835.
*1098 In Hallie, Wisconsin authorized a city to provide sewage services and stated that a city operating a public utility may fix the limits of such service in unincorporated areas. 471 U.S. at 41, 105 S.Ct. 1713. Differing from Boulder, the Supreme Court held that the legislative scheme clearly contemplated that a city may engage in anticompetitive conduct because it empowered cities to refuse to serve certain areas and anticompetitive effects logically would result. Id. at 42-43, 105 S.Ct. 1713. With these principles and cases in mind, the Court analyzes whether a state policy authorizing the alleged anticompetitive conduct exists here.
B. Tennessee's Police Powers
Metro argues that its activity is immune from antitrust laws because of Tennessee's "broad police powers." (Doc. No. 14 at 2.) Metro relies on case law in Tennessee for the proposition that municipalities, as an arm of the state, are given "broad powers of regulation and wide discretion ... [to] enact laws regulating safety and order." Metro. Gov't of Nashville & Davidson Cty. v. Johnston, No. M2012-01537-COA-R3-CV, 2013 WL 247206, at *3 (Tenn. Ct. App. Jan. 22, 2013) (citing Porter v. City of Paris, 184 Tenn. 555, 201 S.W.2d 688, 689 (1947) ).
The broad police powers, addressed in the case law Metro discusses, do not fall under the state action doctrine. In addition to other reasons, these broad police powers are akin to the grant of general or neutral authority found in Boulder, which the Supreme Court held did not satisfy the state action doctrine's "clear articulation" component. The police powers Metro relies upon only allocate the most general authority to Metro to govern local affairs and do not address private security services. As the Supreme Court stated in Boulder, "Acceptance of such a proposition-that the general grant of power to enact [laws regulating safety and order] necessarily implies state authorization to enact specific anticompetitive ordinances-would wholly eviscerate the concepts of 'clear articulation and affirmative expression' that our precedents require." 455 U.S. at 56, 102 S.Ct. 835. Therefore, the broad police powers Metro discusses do not constitute a clearly articulated and affirmatively expressed state policy to authorize anticompetitive conduct and therefore do not provide a basis for antitrust immunity under the state action doctrine.
C. Tennessee's Private Protective Services Licensing Act
Metro also argues that its activity is immune from antitrust laws based on Tennessee's Private Protective Services Licensing Act. Specifically, Metro relies on Tenn. Code Ann. § 62-35-131(a)(2)(B), which provides, "[A] municipality, county or other political subdivision of this state may impose ... Regulations upon any person who furnishes street patrol services, including a requirement that the person register with a designated agency." Under this statute, "person" includes a firm, company, corporation, or similar entity. See Tenn. Code Ann. § 62-35-102(8). "Street patrol service" means "the utilization of foot patrols, motor patrols or any other means of transportation in public areas or on public thoroughfares in order to serve multiple customers or facilities." Id. § 62-35-102(17).
The issue is whether the alleged anticompetitive conduct is the foreseeable result of the power delegated to municipalities under Tenn. Code Ann. § 62-35-131(a)(2)(B). The legislative history of Tenn. Code Ann. § 62-35-131(a)(2)(B) does not reference anticompetitive effects. In addition, no binding precedent involving the state action doctrine appears to involve a legislative scheme directly on point with Tenn. Code Ann. § 62-35-131(a)(2)(B). Thus, the foreseeability analysis begins *1099 with a comparison of Tenn. Code Ann. § 62-35-131(a)(2)(B) to the legislative grant of authority in the previously discussed cases, Boulder and Hallie.
The legislation here more closely resembles the legislation in Boulder than Hallie. Like Colorado's "home rule" amendment in Boulder and unlike the legislation in Hallie, the legislation's text is silent on the question of whether a municipality should displace competition with economic regulation. See Phoebe Putney, 568 U.S. at 225, 133 S.Ct. 1003 (stating that sub-state governmental entities receive immunity from antitrust scrutiny when they act pursuant to a state policy to displace competition with regulation or monopoly public service). Nothing in the statute explicitly confers on municipalities the authority to act anti-competitively. Nor does the authority to regulate street patrol services inherently restrict competition. Although the Tennessee legislature could reasonably anticipate that a municipality could use its Tenn. Code Ann. § 62-35-131(a)(2)(B) powers in anticompetitive ways, this does not mean that the Tennessee legislature expressed an affirmative state policy that municipalities do so. See Kay Elec. Co-op. v. City of Newkirk, 647 F.3d 1039, 1045-46 (10th Cir. 2011) (statute enabling municipality to operate utilities did not confer state action immunity for tying the provision of electrical and sewer services); AmeriCare MedServices, Inc. v. City of Anaheim, No. 8:16-cv-1703-JLS-AFMx, 2017 WL 1836354, at *7 (C.D. Cal. Mar. 28, 2017) (holding that even though the California legislature could reasonably anticipate that a city government could use its powers pursuant to California legislation to act anti-competitively, that California legislation was not enough to confer antitrust immunity because anti-competitive effects were not the inherent result of such authority). As the Supreme Court held in Phoebe Putney, "Our case law makes clear that state-law authority to act is insufficient to establish state-action immunity; the substate governmental entity must also show that it has been delegated authority to act or regulate anticompetitively." 568 U.S. at 228, 133 S.Ct. 1003. Therefore, Metro is not entitled to antitrust immunity under the state action doctrine pursuant to Tenn. Code Ann. § 62-35-131(a)(2)(B).[1]
Even if, assuming arguendo, the above statute could provide a basis for antitrust immunity for Metro's anticompetitive conduct in regards to the regulation of street patrol services, it certainly does not provide a basis for antitrust immunity outside that context. "[T]he fact that a state may have authorized some forms of municipal anticompetitive conduct isn't enough to make all forms of anticompetitive conduct foreseeable. Antitrust violations come in a variety of flavors and just because the state has authorized one doesn't mean it has authorized all." Kay Elec. Co-op. v. City of Newkirk, Okla., 647 F.3d 1039, 1043-44 (10th Cir. 2011) (Gorsuch, J.) (emphasis in original); see also City of Lafayette, La. v. La. Power & Light Co., 435 U.S. 389, 417, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) ("[E]ven a lawful [municipal] monopolist may be subject to antitrust restraints when it seeks to extend or exploit its monopoly in a manner not contemplated by its authorization.").
*1100 Based on the statute's definition of "street patrol services," Tenn. Code Ann. § 62-35-131(a)(2)(B) only authorizes Metro to regulate a person who furnishes patrols in public areas or on public thoroughfares to serve multiple customers or facilities.[2] As Plaintiffs recognize, the security services discussed in the Complaint are not limited to "street patrol services" and much of the alleged anticompetitive conduct does not involve Metro regulating such services. Rather, the Complaint defines the relevant market as "the marketing and sale of private security services in Davidson County," which include "static security, mobile security, and traffic control" and alleges a variety of anticompetitive conduct that does not involve regulating such services, including price setting and requiring vendors to only use MNPD officers for security. (Doc. No. 1 ¶¶ 10, 35.) Although mobile security may be considered a "street patrol service" if it occurs in a public area or thoroughfare to serve multiple customers or facilities, static security and traffic control do not fall within the definition of street patrol services.[3] Thus, Metro's alleged anticompetitive conduct, particularly outside of the regulation of street patrol services, was not a foreseeable consequence of the Tennessee Private Protective Services Licensing Act. See United Nat. Maint., Inc. v. San Diego Convention Ctr. Corp., No. 07-CV-2172 BEN, 2010 WL 3034024, at *1-3 (S.D. Cal. Aug. 3, 2010) (policy requiring that in-house personnel provide all cleaning services was not a foreseeable result of governor's executive order calling on local officials to prevent and respond to terrorist attacks).
Metro also mentions Tenn. Code Ann. § 62-35-103(a)(7), which states that private full-time sworn peace officers, such as Metro police officers, receiving compensation for services as a guard, patrol, or watchperson are exempt from the registration requirements imposed on other contract security employees to be security guards or officers. (See Tenn. Code Ann. § 62-35-102(18) ). However, Tenn. Code Ann. § 62-35-115, which provides for the registration requirements, states that the security guards or officers must obtain the appropriate registration card from the Commissioner of the Tennessee Department of Commerce and Insurance and does not grant the power to regulate the registration of such individuals to municipalities. Therefore, this statute cannot serve as a basis for Metro's antitrust immunity. Accordingly, based on the allegations in the Complaint, Metro is not entitled to antitrust immunity under the state action doctrine.
IV. Conclusion
For the foregoing reasons, Metro's Motion to Dismiss (Doc. No. 13) is denied. The Court will file an accompanying order.

Metro also argues that Command Force Sec., Inc. v. City of Portsmouth, 968 F.Supp. 1069 (E.D. Va. 1997), which held that the city was entitled to antitrust immunity under the state action doctrine, is persuasive here. However, the present case is distinguishable from Command Force. In Command Force, the Virginia statutes: (1) allow localities to adopt ordinances permitting deputy sheriffs and police officers to have off-duty employment; and (2) provide that law enforcement officers employed by Virginia or its political subdivision are exempt from the registration requirement imposed on private security company employees. Id. at 1073. Here, Metro does not rely on a similar statutory scheme.

Street patrol service is a particular type of patrol service under the Private Protective Services Licensing Act. See Tenn. Code Ann. § 62-35-102(16).

As persuasive authority, Metro cites to Tenn. Op. Att'y. Gen. No. 03-022 (Feb. 2003) and appears to argue that directing traffic is considered a street patrol service. (Doc. No. 14 at 4 n.1.) However, that opinion discusses, inter alia , whether a private security officer, who was not also a police officer, could direct traffic on public streets and therefore does not support Metro's position. Metro also cites to Tenn. Op. Att'y. Gen. No. 01-075 (May 2001) for the proposition that Title 62, Chapter 35 of the Tennessee Code gives local governments the ability to restrict or prohibit law enforcement officers from working secondary employment for contract security companies. (Id. at 5.) Yet, the opinion does not support that assertion. Thus, neither Attorney General opinions Metro discusses are persuasive here.